# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00187-CV

### J. M. and R. A. G., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE 428TH DISTRICT COURT OF HAYS COUNTY
### NO. 21-0539, THE HONORABLE SHERRI TIBBE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

J.M. (Father) and R.A.G. (Mother) appeal from the trial court's final decree of termination and order for conservatorship.[1] Following a jury trial, the court rendered judgment on the jury's verdict that Father's and Mother's parental rights to their three children, E.L., M.M., and J.M., should be terminated and appointed the Texas Department of Family and Protective Services as the children's permanent managing conservator. In his appellate issue, Father argues that the evidence was legally and factually insufficient to support the finding that termination of his parental rights was in the children's best interest. In her appellate issues, Mother argues that the evidence was legally and factually insufficient to support the jury's predicate-ground and best-interest findings as to her and asserts that her trial attorney

---

[1] We refer to the parents as Father and Mother and we refer to their children by their initials. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

provided ineffective assistance of counsel.  For the following reasons, we affirm the final decree of termination and order for conservatorship.

## BACKGROUND

In May 2020, the Department received a report that Father was engaged in criminal activity, including possession and distribution of illegal drugs and possession of firearms.  It was also reported to the Department that Mother had continued to allow Father to remain in the home and in the presence of small children, E.L., who was then four years old, and M.M., who was then two years old.  The Department obtained police reports that confirmed Father's criminal activity, indicated that Father and Mother had a history of domestic violence, and validated its concerns about Mother continuing to allow Father to remain in the home with her and the children.  The Department believed that the children were endangered by Father's criminal conduct, the incidences of domestic violence against both mother and other of his children, and Mother's failure to protect them.  The Department determined that allowing the children to remain in the home would be contrary to their welfare.  The Department filed an original petition concerning E.L. and M.M.—J.M. had not yet been born—and sought a non-emergency removal.  The trial court appointed the Department as E.L. and M.M.'s temporary managing conservator and removed the children from the parents' care.

In March 2021, J.M. was born and the Department filed an original petition concerning him and sought emergency removal.  The Department based its request on Father's positive drug tests and extensive involvement in criminal activity along with the fact that Mother continued to allow Father to remain in the home and continued her relationship with him despite the Department's informing her that any child in her possession would be removed if that

2

relationship continued. While in the hospital, Mother told the Department investigator that she had ended her relationship with Father and was no longer living with him, but nurses reported that Father was present at J.M.'s delivery, that Mother and Father were talking about getting married, and that the couple were discussing the "baby stuff" they bought for their apartment. The investigator also spoke to the Department caseworker assigned to the case involving E.L. and M.M. and was informed that Father and Mother were still in a relationship and reportedly lived together. The caseworker also stated that Mother knew that the Department would seek removal of J.M. if she remained in a relationship with Father. The trial court appointed the Department as J.M.'s temporary managing conservator and removed him from the parents' care.

The trial court consolidated the Department's two cases prior to a jury trial that was held in March 2022, when E.L. was six years old, M.M. was four years old, and J.M. was one year old. Mother and Father were both present and represented by separate counsel. The witnesses at trial included Mother, Father, police officers, Department caseworkers and investigators, a Court Appointed Special Advocate, and licensed professional therapists.

*Department Investigator's Testimony*

Arlene Castro, a Department investigator, testified that the Department received a report that Father and the child's biological father had punched one of Mother's other children. Additionally, the Department believed that Mother had allowed one of her sons, who had an open juvenile case related to alleged sexual abuse of one of his father's other children, to live in the same home as E.L. and M.M and her. Castro testified that Father had an extensive criminal history including gun charges, drug charges, and domestic violence charges both in his current and previous relationships. Although she tried to speak to both Father and Mother during her

3

investigation, she was able to speak with Mother only. Mother would engage in conversation with her, but Father would ignore her and refuse to answer her questions. Castor's investigation discovered neglectful parenting by Mother and Father as well as domestic violence between Mother and Father. There was also drug use in the home, and Father refused to take a drug test. E.L. and M.M. had clothes and food, which Castro described as the "minimum qualifications" for them. They were not, however, enrolled in any school or Head Start programs. Castro identified her main concerns as the fact that Mother's oldest son was in the home with Mother's daughter even though the son was on probation for a sex offense. Father was also out on bond for having punched Mother's other son, who was not living in the home. Castro testified that Father had an extensive criminal history and was using and distributing drugs. Based on her investigation, Castro developed a serious concern for the safety of E.L. and M.M. Castro believed that Father's previous criminal history indicated a propensity for committing violent acts around children as well as endangering them by selling and using drugs in the home.

Castro testified that experiencing trauma has profound effects on children, including developmental delays, stunted growth, and emotional damage. The Department requested that the court order Father, Mother, E.L., and M.M. to submit to drug testing. Father did not take a drug test and M.M. tested positive for amphetamine and methamphetamine. The fact that M.M., who was two years old, tested positive for these drugs indicated to the Department that someone was using or cooking drugs in the presence of the children. Based on the positive drug test, the Department removed the children from Father and Mother's care. Before doing so, however, Castro spoke to Mother about the possibility that the children could remain in her care if she moved away from Father and engaged in services recommended by the Department. Castro stated that Mother did not want to do that. The children were then placed

4

with their paternal grandfather and step-grandmother. After that, Castro had no further involvement with the case.

*Department Caseworkers' Testimony*

Kalyn Noyes was the Department conservatorship caseworker originally assigned to the case when E.L. and M.M. were removed from Mother and Father's care in June 2020 and the Department became their temporary managing conservator. Noyes stated that they were removed from Mother and Father's care due to allegations of drug use and domestic violence between the parents.[2] Noyes contacted Mother and Father to explain the conservatorship case process and the Department scheduled a family group conference. At the conference Noyes discussed the proposed family service plan, which is the Department recommendation of services that the Department believes could alleviate the concerns that brought the children into its care. Noyes reviewed the service plan with Mother and Father and their respective attorneys, and it was made an order of the court at a status hearing held in September 2020. Father was ordered to participate in nurturing parenting and protective parenting courses, complete a Battering Intervention and Prevention Program (BIPP), participate in individual therapy, and refrain from engaging in criminal activity. He was also ordered to communicate monthly with Noyes and attend visitation and court hearings. Mother was ordered to participate in similar services in addition to undergoing a psychological evaluation.

Noyes testified that Mother participated in individual therapy, completed a psychological evaluation, and took the required parenting classes. Nevertheless, Noyes testified, she observed no resulting behavioral changes, and Mother continued to remain in a relationship

---

[2] Noyes testified that Father has had three prior cases brought by the Department based on neglectful supervision and physical neglect of other of his children.

with Father despite concerns about domestic violence between the two of them. Although Mother initially had a negative drug test, after J.M. was born and removed from her care by the Department in March 2021, she was inconsistent about submitting to court-ordered drug testing. Noyes had regular communications with Mother, but those communications diminished over time. Father was inconsistent and communication between Noyes and Father varied from good communication to Father's sending text messages complaining that Noyes was an awful person and caseworker. Noyes described her communication with Father as unproductive. Noyes related an incident when Father came to the Department and began yelling at her, accusing her of lying to the court, and told her to correct her lies "or else." At that point, Noyes began including Father's attorneys in their communications. Noyes continued to inform Father about the services he was ordered to participate in and continued to send him referrals to service providers. Noyes recounted the various ways she unsuccessfully attempted to assist Father complete the court-ordered services until September 2021, when she was replaced by a different Department caseworker.

Noyes discussed the important role of drug testing in the case, stating that drug testing can demonstrate a pattern of change in behavior the Department is trying to accomplish. Drug testing can show sobriety for long periods of time, which in turn can alleviate the Department's concerns about the children's safety if returned to their parents. Noyes described Father's sporadic compliance with requested drug testing and testified that his first drug test, which he did not take until December 2020, was positive for methamphetamine. Father did not submit to drug tests scheduled in January, February, or March 2021. Noyes described Mother's history of drug testing, including that, because she had colored her hair, the Department requested that she submit nail samples. The sample submitted in January 2021 was not sufficient

6

to provide accurate results. Noyes testified that the Department continues to have concerns about Mother's and Father's drug use.

In March 2021, J.M. was born and the Department sought and gained temporary managing conservatorship over him in April 2021. Noyes testified that she had not noted any significant progress by Mother or Father from the initial removal of E.L. and M.M. in June 2020 until March 2021. During that time, Noyes became concerned because she was informed by E.L. and M.M.'s placement that Father and Mother were harassing and threatening her.

Noyes testified that, although the children have had to move several times, the plan is for them to return to a foster family they had previously lived with in Dallas once the foster home is re-licensed, and that home would be a "good potential forever home" for them. When the children were previously living in that home they were doing well. E.L., who was six at the time of trial, was attending school and getting good grades. Noyes described him as sweet and smart but also sensitive and very caring. M.M., who was four, was growing into her personality and Noyes described her as "sassy." J.M. had just turned one at the time of trial and Noyes described him as a "little chubby bunny." Since September 2021, the children had been placed together. The children have no special medical needs but were receiving therapy for emotional needs and to address any frustration or anxiety. The proposed placement would continue to provide this professional emotional support.

Noyes testified that the Department's goal and policy is always for children to be placed with family members. Noyes recounted that the Department had considered 19 different relative placements provided by Father and Mother. However, based on criminal history, Department history, or lack of communication from the potential placements, the Department

was unable to move forward with any of those placements. Noyes testified that she did not believe that either Mother or Father could provide a safe and stable home for the children.

Noyes was particularly concerned with information she received when J.M. was born that, although Mother had told her she was living separately from Father, that was not true and the two had never separated. Noyes opined that Mother's continuing to be in a relationship with men who expose her children to domestic violence constituted conduct that endangered the children. Noyes stated that being raised in that environment can cause them trauma and result in behavioral issues as the children grow up. Noyes also opined that she believed Father's continuing to engage in criminal conduct that could result in incarceration endangered his children because he would not be able to care for his children if he were incarcerated. Noyes stated that the biggest obstacle to family reunification in this case was the concerns about ongoing drug use, as evidenced by positive or missing drug tests, concerns about ongoing domestic violence, and Mother's and Father's lack of consistent communication with the Department. In particular, Noyes was concerned about Mother's failure to be forthcoming about her desire to continue her relationship with Father, which prevented the Department from recommending couples therapy or other services relevant to that ongoing relationship. Noyes testified that the Department was asking that Mother's and Father's parental rights to E.L., M.M., and J.M. be terminated and that termination of those parental rights was in the children's best interest. As reasons supporting this opinion, Noyes testified that the children could then live in a safe, secure, drug free, crime free home with people who could raise them to be happy and secure. Although acknowledging that Mother loves the children and they love her, Noyes testified that Father and Mother had not made the behavioral changes necessary to meet the children's emotional or physical needs. Noyes stated that, in her opinion, termination of Mother's

8

and Father's parental rights was necessary to protect the children and allow them to move on with their childhood free from exposure to domestic violence, drug use, and criminal conduct.

Claralis Diaz, a conservatorship specialist with the Department, testified that she was assigned to the case in September 2021. She continued to have the same concerns about substance abuse, domestic violence, and Father's ongoing criminal activity as had the previous caseworker. Although Mother was very communicative with Diaz, Father was not. Diaz was able to meet with Father in November 2021, at which time they went over the service plan. Father appeared to her to be defensive about being asked to participate in the services. Diaz testified that Father also failed to submit to drug tests in October and November 2021 and in January 2022. During the time Diaz was the assigned caseworker, from September 2021 to February 2022, Father did not complete any of his domestic violence courses or individual counseling. Diaz also worked with Mother, attempting unsuccessfully to reengage her in individual therapy. Diaz testified that Mother's September 2021 nail drug test came back positive for methamphetamine, but her hair, urine, and alcohol tests that month were negative. Diaz was concerned that Mother had bleached her hair, which is why the Department requested nail drug tests. Mother did not submit to drug testing in December 2021 or January 2022. In February 2022, the case was transferred back to Noyes.

*CASA's Testimony*

Elizabeth Medellin testified that she was the Court Appointed Special Advocate supervisor for E.L., M.M., and J.M. Medellin met with Mother personally once, and then due to COVID restrictions, several times over the phone and virtually. Medellin reviewed Mother's service plan to ensure that she understood its requirements. Mother told Medellin that she was

9

living with a friend, but then Mother reported that she was going to get an apartment, which concerned Medellin because she believed it was in the same complex that Father was living in. Mother had led Medellin to believe that she and Father were no longer in a relationship, but Medellin later learned that that was untrue. Nevertheless, Medellin and other CASA volunteers continued to try to assist Mother to complete her services and find stable housing. Medellin testified that the assistance CASA provided Mother was "above minimum standards" but was her customary practice as a CASA supervisor.

Medellin also sent Father information about similar resources to those provided to Mother. This included resources for obtaining free health insurance and COVID testing. Father expressed to Medellin that he wanted to visit the children and Medellin explained that as a condition of visits, Father had to submit to a drug test and have a negative result. Medellin explained that she wanted Father to know that "the ball was in his court" and that if he really wanted to visit the children, he needed to submit to a drug test. She also advised Father that a missed drug test would be presumed to be a positive test for all substances.

Medellin testified that although Mother started off making progress, as time went on "it started going the other way." After a visit between Mother and J.M., who was a baby, Medellin noted that even though they had spent very little time together, J.M. knew Mother was his mom. Medellin stated that she encouraged Mother to keep working on her services and not to give up and she tried to remind Mother of her worth and value. Medellin was also concerned that Mother might have been under the influence of something during the visit with J.M. because her pupils were hyper-constricted. Medellin testified that after that visit, Mother tested positive for methamphetamine. Because of this positive drug test and Mother's failure to submit to drug

10

tests and failure to appear at a visit after J.M. had been driven four hours to the meeting location, Medellin requested that the visits cease.

Medellin testified that E.L. and M.M. had been doing really well in their first two placements, but each of those had to end because in the first, the foster placement was allowing the children to spend unsupervised time with Mother and Father, and in the second, when the foster parent refused to permit Father to spend time with the children he harassed and threatened her. E.L. and M.M. then moved to a foster placement in Dallas, where they did very well. They began joking around with each other, were doing really well in school, and all their needs were being met. The baby, J.M., was initially in a different placement because he was an infant. He struggled at first with digestive issues but, according to Medellin, "has come a long way." Medellin reported that the children are now in a placement together and they are happy to be together. Medellin stated that the children are bonded with their caregivers and that she would be in favor of them being placed in the home in Dallas. Medellin testified that she did not believe Mother and Father would be able to meet the children's needs. Medellin stated that, in her opinion based on the evidence she had heard at trial, termination of Mother's and Father's parental rights to the children was in their best interest. Medellin cited the lack of change in the parents' behavior and the consistent patterns of behaviors that led to the removal of the children from their parents' care. Medellin testified that she did not believe Mother and Father's home was safe enough for the children to return to it. CASA looked at eleven relative and two fictive kin placements and none of them were suitable placements for the children, primarily because the Department's home studies excluded them as possible placements.

Medellin testified that one of her main concerns was that neither Mother nor Father had ever been able to address the issues raised by the Department or express a willingness

11

to understand why the Department has concerns about returning their children to them. Medellin also expressed concern that Father's criminal conduct continued to be an issue. She also stated that the drug use concerns have not been resolved, mainly because of a lack of drug testing. Medellin testified that there had been ongoing domestic violence between Father and Mother during the pendency of the case, including an incident in January 2021 and an earlier report of domestic violence when Mother was pregnant with J.M.

Medellin testified that CASA's goal was to have the children be made eligible for adoption because they have been "going through it long enough" and need some permanency and normalcy in their lives. Medellin did not believe either Mother or Father were stable or could provide a stable home for the children. She further testified that neither Mother nor Father had shown a willingness or ability to provide the children with a safe and stable environment.

*Licensed Professional Counselor's Testimony*

Erin Mendoza, a licensed professional counselor at Daybreak Counseling, testified that she provided counseling services to Father and Mother. In August 2020 she provided protective parenting services to Father, who completed seven of the eight topics. Mother completed the entire protective parenting services program and also participated in individual counseling in October 2020 and a nurturing parenting group. Mendoza and Mother discussed domestic violence issues and Mother expressed that in her relationships the other person did not take responsibility for their behaviors and blamed her for everything. Mendoza believed that Mother was making progress practicing values that were important for healthy relationships but in January 2021, Mother stopped attending individual therapy sessions, so Mendoza discharged her as a client. Mendoza stated her opinion that Mother recognizes the red

flags of domestic violence but rationalized Father's behavior by making excuses for it or minimizing it.

*Mother's Testimony*

Mother became pregnant with E.L. while she was in the process of ending a relationship with the father of her four other children. E.L. was born in 2015. Mother continued seeing Father, and their second child, M.M., was born in 2017, at which time Mother and Father began living together. Mother denied that she ever used drugs and stated that she had never seen Father use drugs, although she acknowledged that Father has been arrested for drug possession both before and after the children were removed from her care. Mother also denied allowing anyone into her house who used drugs. Mother stated that although she had bonded Father out of jail several times, she was unaware of how many criminal charges are currently pending against him or what he has been charged with. Mother testified that although Father has been charged with "putting his hands" on one of her other four children, he had not actually done so. Mother also denied that Father had ever threatened or assaulted any of her family members and stated that she did not consider herself to be a victim of or a perpetrator of domestic violence. In April 2018, Mother called the police to report that Father had assaulted her. Mother testified that she could not remember any of the details of that incident but agreed that she had told the responding officer that Father had "slapped [her] three times and busted her nose." Mother denied that there had been any other incidents of domestic violence between her and Father. In April 2020, Mother called the police to report that Father had stolen her car. At trial, Mother testified that she and Father had gotten into a non-physical argument and she had called the police to report the stolen vehicle but that it was not a "big deal."

13

In January 2021, while Mother was pregnant with J.M. and she and Father were separating, Mother's sister called the police to report that Father had stolen Mother's car. Mother denied telling the responding officer that she had bruises all over her body and that her daughter had had to pull Father off her to keep him from continuing to assault her. She did admit telling an officer that she was "calling things off" with Father.

Mother testified that the Department became involved with her and Father's children because of concerns about domestic violence and drug use. Mother was adamant in her testimony that she is not a victim of domestic violence.

Mother testified that she would like to see the children placed with their paternal grandmother. She also stated that she loves her children, has always supported them, and would prefer to have them home with her. Mother stated that she had raised all her children "the right way" and described the successes of two of her other older children.

Mother stated that she understood when she was given a court-ordered service plan that the consequence of not complying with the plan could be termination of her parental rights. Mother completed a psychological evaluation, a nurturing parenting class, and a class about domestic violence. She also completed an OSAR and participated in some therapy sessions but was discharged from individual therapy after missing five sessions. The Department referred Mother to a new therapist. Mother told the new therapist that Father was nice and respectful to her, but that they were not together. Later, Mother admitted to the therapist that she had not been truthful about her relationship with Father and that in fact they had been together. Mother was discharged from the second therapist after she missed several sessions. The Department then referred Mother to a third therapist for individual counseling and Mother was again

14

discharged due to her failure to attend sessions. Mother testified, however, that she had enjoyed her therapy sessions and believed she had benefitted from them.

Mother testified that she has been working at Popeye's for the previous five months and also worked one day a week performing janitorial services at Harris Hill Raceway. During the pendency of the case, she and Father lived at a residence together but had moved out to rent a room from Mother's cousin. Mother testified that, at the time of the trial, she and Father had been living with her father and stepmother for three months.

Submitting to drug tests was part of Mother's court-ordered service plan. Mother testified that she had a negative drug test in March 2021 but had a positive test in April 2021. Mother stated that she was not sure why she had tested positive for methamphetamine because she was not using it and did not spend time with people who were using drugs. Mother did not show up for her scheduled drug tests in May, June, and July. In September, Mother submitted a nail drug test, which was positive. Mother testified that she believed the subsequent drug tests were either negative or cancelled. Mother missed drug tests scheduled in February and March 2022. Mother testified that she had, however, gone to and passed "most" of her hair strand and urine drug tests.

Mother acknowledged that the Department had, at the beginning of the case, offered to permit the children to stay with her if she stopped living with Father. Mother declined to have Father move out because "there's nothing really wrong with him" and he is "not a bad person." Mother denied, however, choosing Father over having her children stay with her at home. Mother testified that she "chose [Father] to help us fight for our kids together. That's what I chose."

15

*Father's Testimony*

Father testified that, in addition to E.L., M.M., and J.M., he has seven other children. Father testified that he had been charged with domestic violence against the mother of six of the other seven children. Father denied allegations that he had slapped her and testified that he believed that the case had been dismissed. Father stated that in 2018 he was charged with assaulting Mother, but that case was also dismissed the day of trial. Father denied possessing any firearms.

When asked about the Department's investigation, which began in early 2020, Father stated that he had submitted to a court-ordered drug test and tested positive for methamphetamine. Father stated that M.M. had also tested positive but he had "no idea" why. Father stated that he refused to comply with subsequent requests that he submit to drug tests because he feared for his safety based on his negative opinion of the drug testing facility. Father testified that he completed some of his court-ordered service plan, including taking a nurturing parent class and completing an OSAR assessment. Father denied having a substance abuse problem. Father did not participate in individual therapy or domestic violence counseling. Father stated that the Department's caseworker did not communicate with him and had informed the court that she feared for her safety around him. Father attributed the caseworker's lack of direct communication with him on her desire that he "fail."

Father testified that he no longer uses alcohol after being arrested for driving while intoxicated with a child in the car in 2015, taking an impact class, and fulfilling two years of probation. Father stated that he enrolled himself in the impact class and took safety courses and a driver's education program. Father denied that he had any history of domestic violence because, although he had been arrested several times, he was never convicted. Father

acknowledged, however, that were several criminal cases pending against him, including a charge for aggravated assault with a deadly weapon, reckless driving, driving with an invalid license, injury to a child, and possession of a controlled substance with intent to deliver. When Father was shown evidence at trial that he had in fact been convicted in February 2018 of committing family violence against Mother, he stated that he must have been lied to about the case having been dismissed.

Father described his employment as going to Popeye's and to the Raceway to help Mother with her job responsibilities and that they act as a team. He described his housing situation as "kind of impossible" because he and Mother are so focused on trying to get their children returned to them. At the time of trial, Father and Mother were staying with Mother's father. Father testified that he wants the children to be returned to him or, alternatively, placed with his relatives.

*BIPP Counselor's Testimony*

Teresa Bethany, a BIPP resolution counselor, also testified at trial. BIPP is a processing group for men and women who have either been accused of domestic violence or have a history of domestic or partner violence. Bethany testified that the program's primary goal is accountability. Bethany met Father in February 2022 at his intake appointment for the BIPP program. Father expressed frustration with being ordered to participate in BIPP because he believed he was being set up to fail. Bethany testified that Father never started the BIPP program.

*Officer Basil Pierce's Testimony*

Officer Basil Pierce, a City of San Marcos police officer, testified about his interactions with Father and Mother. In April 2020, Officer Pierce responded to a call about a

17

stolen vehicle. Mother had reported that she believed Father had stolen her car. After hearing the description and possible location of the vehicle, Officer Pierce saw a car matching the description and conducted a traffic stop of the vehicle. Because Father had a history of carrying a firearm and had previously been arrested for aggravated assault with a deadly weapon, Officer Pierce waited for other officers to assist with the traffic stop. During the stop, officers found a handgun and narcotics in the vehicle along with plastic baggies and a scale—paraphernalia Officer Pierce described as being associated with narcotic sales. Father denied knowing that the gun or drugs were in the vehicle and claimed they belonged to his girlfriend. Officer Pierce found that explanation suspicious because the handgun was in a backpack that contained other "male specific items" such as men's deodorant and cologne. Officer Pierce arrested Father and took him to the jail where he was charged with possession of cocaine, methamphetamine, and MDMA, and also with possessing a firearm after a prior conviction of a family violence offense.

The next contact Officer Pierce had with Father was when, in January 2021, Mother again called the police to report that her vehicle had been stolen. Because Mother had declined to press charges when Father previously took her vehicle, Officer Pierce called her to ask for more details and to verify whether she wanted him to pursue the investigation. Mother reported that she and Father had gotten into an argument and that he had taken her vehicle. Concluding that the issue was more of a civil issue between two domestic partners, Officer Pierce advised Mother to contact the Guadalupe County Sheriff's Office to assist with further handling of the investigation. A short time later, Officer Pierce received a call from one of Mother's daughters and ended up speaking with Mother. Mother stated that she had bruises all over her body that were inflicted three days earlier by Father. Mother agreed to come to the police department for a further interview with Officer Pierce but ultimately never showed up.

18

Officer Pierce referred the case to the City's Criminal Investigations Division and had no further involvement. After reviewing his report, Officer Pierce confirmed that Mother stated that she was separating from Father because he had beaten her, and that the physical altercation only ended when her daughter pulled him off her.

*Officer Jack Williams' Testimony*

Officer Jack Williams, a San Marcos Police Department Patrol Officer, testified at trial about his interactions with Father and Mother. Officer Williams stated that in November 2019, when responding to a call to perform a welfare check, he spoke with Mother's former partner who said his son had been assaulted by Father. Mother's former partner told Officer Williams that Father had hit one of Mother's and her former partner's children in the face after arguing about a lollipop Mother had bought the child, and that the child had a cut lip. Officer Williams spoke to Mother about the incident, and she denied that Father had struck the child. Having seen the cut on the child's lip, Officer Williams determined that the case warranted further investigation. Officer Williams testified that he believed a warrant had been issued for Father but was unaware of the further status of the case.

*Officer Franco Stewart's Testimony*

Franco Stewart, a City of San Marcos police officer, testified about his interactions with Father and Mother. In March 2021 he responded to a call from Mother and Father's neighbor who heard them arguing and believed some sort of violence was occurring. When he arrived, he was told that there was an ongoing argument and a woman had called for help from Mother and Father's apartment. When he approached the apartment, he heard Father and Mother yelling at each other. When he looked through the window, he saw Mother and

19

waved at her. She waved back but then immediately closed the curtains so Officer Stewart could no longer see her. He also noticed glass from a broken window on the ground outside the apartment. Officer Stewart then knocked on the door and Father opened it and asked what the officer wanted. Officer Stewart said that he needed to speak with Mother to make sure she was okay. Father responded that everything was fine and asked Officer Stewart to leave. After repeating that he needed to ensure that Mother was unharmed, Officer Stewart told Father that if he was not allowed in, he would make a forced entry. Father responded that the officer needed a warrant if he wanted to enter the apartment. Citing exigent circumstances, Officer Stewart made a forced entry into the apartment. Once in the apartment, Officer Stewart observed narcotic residue on the kitchen countertop and saw bruising on Mother's right arm and left bicep. The police obtained a search warrant for the apartment and discovered narcotics and a shotgun in one of the bedrooms. When asked about the bruises, Mother declined to provide information but did say that she had not answered the door because she was afraid to. Father was charged with possession of controlled substances and interfering with public duties.

*Officer Travis Davidson's Testimony*

Travis Davidson, formerly an officer with the City of San Marcos Police Department,[3] testified about his interactions with Mother and Father in 2018. In April 2018, he was called to an apartment building by Mother who reported that Father had assaulted her and then left. When he met with Mother on the landing outside her apartment, Mother was crying and had a bloody nose. Mother stated that Father had assaulted her, shoved her, held his hand

---

[3] At the time of trial, Davidson was a detective with the City of San Marcos Criminal Investigations Unit. Because his interactions with Mother and Father took place while he was a patrol officer, we will refer to him as Officer Davidson.

around her neck, and slapped her three times. Mother also told Officer Davidson that Father had previously assaulted her approximately 10 times in the five months she and Father had been together, but she did not report the incidents because she was afraid of Father. Officer Davidson took photographs of Mother's injuries and filed a police report. He was called back to the apartment the next day because Father had kicked open the door and Mother and Father were screaming at each other. Officer Davidson testified that Mother and Father were "trying to work on their relationship" but Father was intoxicated and had kicked the door off the hinges. Father was arrested for public intoxication. In November 2019, Officer Davidson was notified of a shooting at an apartment building in San Marcos. Officer Davidson stated that the police believed that Father had shot a man who was talking to one of his daughters. Father was arrested that night and charged with aggravated assault with a deadly weapon.

*Father's Brother*

Father's brother testified about his interactions with the Department when they conducted a home study. Brother denied telling the Department that Father and Mother used drugs. Brother testified that Father has never used drugs in his presence. Brother stated that Father had installed cameras in his home because when he tried to get Mother to take her medication she would "blow up on him" and he wanted video recordings in case "he ever got blamed for anything." Brother stated that Father believed that Mother was bipolar and that she would refuse to take her medication. Father also showed Brother damage to the apartment that he said was caused by Mother, including a broken television and holes in the walls.

After the parties rested, the case was submitted to the jury. The trial court's charge submitted several grounds for termination of parental rights in the disjunctive as to each

21

parent. The jury found that there was clear and convincing evidence (1) to terminate Mother's parental rights under sections 161.001(b)(1)(D), (E), and (O) of the Texas Family Code and that termination of her parental rights was in the children's best interests, and (2) to terminate Father's rights under sections 161.001(b)(1)(D), (E), and (O) of the Texas Family Code and that termination of his parental rights was in the children's best interest. The jury further found that the Department should be appointed as the children's managing conservator. The trial court signed a decree of termination in conformity with the jury's verdict. Neither Father nor Mother filed a motion for directed verdict, objected to the submission of a jury question, moved for judgment notwithstanding the verdict, or moved for a new trial. Mother's and Father's appeals followed.

## ANALYSIS

### Mother's Appeal

In appellate issues one through four, Mother challenges the legal and factual sufficiency of the evidence supporting the finding that she knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the children's physical or emotional well-being, engaged in conduct or knowingly placed children with persons who engaged in conduct which endangered the children's physical or emotional well-being, and failed to comply with court-ordered services. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). In her fifth appellate issue, Mother challenges the legal and factual sufficiency of the evidence supporting the finding that it was in the children's best interest for Mother's parental rights to be terminated. *See id.* § 161.001(b)(2). In her sixth issue, Mother asserts that she

22

received ineffective assistance of counsel by attorneys representing her at hearings before an associate judge and during the jury trial.

*Preservation of Error as to Legal and Factual Sufficiency*

In an appeal from a judgment rendered on a jury's verdict, including a judgment terminating parental rights, a party cannot complain of the legal and factual sufficiency of the evidence for the first time on appeal. *See* Tex. R. Civ. P. 33.1(d). To preserve a challenge to the legal sufficiency of the evidence, a party must either (1) move for a directed verdict, (2) object to the submission of a jury question, (3) move for judgment notwithstanding the verdict, or (4) move for a new trial. *See In re J.M. S.*, 43 S.W.3d 60, 62 (Tex. App.—Houston [1st Dist.] 2001, no pet.); *A.B. v. Texas Dep't of Family & Protective Servs.*, No. 03-17-00658-CV, 2018 WL 1220894, at *2 (Tex. App.—Austin Mar. 9, 2018, no pet.) (mem. op.). To preserve a challenge to the factual sufficiency of the evidence, a party must move for a new trial. *See In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003) (applying Texas Rule of Civil Procedure 324(b)(2) requiring motion for new trial to preserve complaint of factual sufficiency to support jury finding in parental termination cases); *A.B. v. Texas Dep't of Family & Protective Servs.*, 2018 WL 1220894, at *2. Here, the record reflects that neither Father nor Mother moved for a directed verdict, objected to the submission of a jury question, moved for judgment notwithstanding the verdict, or moved for new trial. Because Mother failed to take any action to preserve her sufficiency challenges, the complaints have been waived.

However, even if Mother's sufficiency challenges had been preserved, we could not conclude on this record that they have merit. "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial

protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018); *see also In re J.W.*, 645 S.W.3d 726, 740 (Tex. 2022) ("A parent's fundamental right to the care, custody, and control of his child is of constitutional magnitude."). The trial court may order termination of the parent-child relationship if clear and convincing evidence supports that a parent engaged in one or more of the enumerated grounds for termination and that termination is in the best interest of the child. *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (citing Tex. Fam. Code § 161.001(b)); *see also A.C. v. Texas Dep't of Family & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.— Austin 2019, pet. denied). The clear and convincing standard is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see also* Tex. Fam. Code § 101.007 (defining "clear and convincing evidence"). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d at 630; *see also In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (explaining that "[d]ue process requires the application of the clear and convincing evidence standard of proof in parental termination cases").

In appeals involving the termination of parental rights, legal sufficiency review of the evidence requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re A.C.*, 560 S.W.3d at 630-31. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could

not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* In reviewing the sufficiency of the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *see also In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (noting that witness credibility issues that depend on appearance and demeanor "cannot be weighed by the appellate court; the witnesses are not present").

Because Mother attacks the legal sufficiency of adverse findings on issues on which she did not have the burden of proof, she must demonstrate that there is no evidence to support the adverse finding. In reviewing a no-evidence challenge, we consider the evidence in a light most favorable to the verdict; assume that the factfinder resolved disputed facts in favor of its findings if a reasonable factfinder could have done so and disregard all contrary evidence that a reasonable factfinder could have disbelieved or found to be incredible. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Because Mother also attacks the factual sufficiency of adverse findings on issues on which she did not have the burden of proof, she must demonstrate that there is insufficient evidence to support the adverse finding. A factual-sufficiency challenge will be overruled if, considering all of the evidence in the record—both that which supports and that which contradicts the finding—the factfinder reasonably could form a firm conviction or belief that the parent committed one of the alleged grounds for termination and that the termination of parental rights is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28-29.

*Predicate Grounds*

In issues one through four Mother challenges the legal and factual sufficiency of the evidence to support the jury's findings as to the predicate statutory grounds to support termination of her parental rights. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). Because termination of a parent's rights can stand on one statutory ground plus a best interest finding, we limit our review to Mother's first issue that challenges the evidence to support the ground set out in section 161.001(b)(1)(D) of the Family Code—that she knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the children's physical or emotional well-being.

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone," and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861 at *4 (Tex. App.—Austin Dec. 23, no pet.) (mem. op.). "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Id.* "Moreover, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied) (citation omitted).

26

The relevant inquiry under subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Fam. Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home . . . is part of the 'conditions or surroundings' of the child's home under subsection (D)." *Id.* at *4 (citing *In re M.R.J.M.*, 280 S.W.3d 494 (Tex. App.—Fort Worth 2009, no pet.)).

Mother argues that the evidence was legally insufficient to support termination under subsection (D) because "the sole reason behind the children's removal was the supposed criminal conduct of [Father] and [Mother's] refusal to separate herself from [Father]." Mother further argues that the law enforcement officers never arrested Father for domestic violence and the officers did not testify that they ever saw children "present when they arrived on scene in response to allegations of verbal or physical altercations between the parties."

The acceptability of living conditions and parental conduct in the home are subsumed in the endangerment analysis. *See In re J.E.M.M.*, 532 S.W.3d 874, 880-81 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Likewise, "inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home" under subsection (D). *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.). There was evidence admitted at trial supporting the endangerment finding, including evidence of physical violence between Mother and Father. There was testimony that Father hit Mother in the face and bloodied her nose, as well as Mother's own reports to law enforcement that she had been bruised and beaten by Father. Moreover, there was

testimony and exhibits admitted at trial that confirmed Father's extensive criminal history, including charges of aggravated assault, firearm possession, and drug possession and distribution. There was also evidence that Mother used drugs, and the jury could infer that her missed drug tests constituted positive test results. Several witnesses testified that Mother was aware of Father's criminal conduct and drug use, yet refused to live separately from him and, in fact, attempted to conceal her continuing relationship with him despite the Department's admonition that she would not be reunited with her children if she continued her relationship with Father. There was also ample evidence that Mother denied that Father engaged in domestic violence, denied that he used drugs, and minimized his criminal behavior. Physical violence in the home leads to an unstable and unpredictable environment for children. *In re O.E.R.*, 573 S.W.3d 896, 905 (Tex. App.—El Paso 2019, no pet.). A parent's use of narcotics and its effect on her ability to parent can qualify as an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Illustrating that danger, M.M. tested positive for methamphetamine when she was two years old, which a Department investigator testified indicated that someone was using or cooking drugs in the presence of the children.

Viewing the evidence under the applicable standard of review for legal sufficiency, we conclude that the evidence was legally sufficient to support the jury's finding under subsection (D). Viewing the evidence under the factual sufficiency standard, we conclude that the evidence, including Mother's own drug use, her refusal to live separately from Father despite evidence of extensive domestic violence, and her minimizing the severity of Father's violent and criminal conduct, is such that the factfinder could reasonably have formed a firm belief or conviction that Mother knowingly placed or knowingly allowed the children to remain

28

in conditions or surroundings which endangered the children's physical or emotional well-being. We overrule Mother's first appellate issue.

*Best Interest*

In her fifth issue, Mother challenges the legal and factual sufficiency of the evidence supporting the finding that terminating her parental rights to E.L., M.M., and J.M. was in the children's best interest. When deciding the best interest of a child, factors the court considers include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's conduct which may indicate that the existing parent-child relationship is not a proper one, and any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also In re A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). This list of factors is not exhaustive, not all of them need to be proven to determine a child's best interest, and analysis of a single factor may be adequate in a particular factual situation. *See In re C.H.*, 89 S.W.3d at 27; *Holley*, 544 S.W.2d at 372.

Without explaining why, Mother asserts on appeal that the evidence was legally and factually insufficient to support a finding that termination of her parental rights was in her children's best interest. In this case, there was evidence that the children have been exposed to domestic violence and Mother's drug abuse. Mother had a positive drug test before and after J.M. was born, and her failure to drug test on several occasions supports an inference of drug use. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (recognizing

that fact finder could reasonably infer that parent's failure to complete scheduled screenings was because she was using drugs). Mother also lied about ending her relationship with Father and continued to live with him despite evidence of a number of incidences of domestic violence between them. Although she later denied that she was the victim of domestic violence committed by Father, three police officers testified regarding their experience responding to domestic disputes between Father and Mother, and Mother reported to police that Father had beaten her and given her a bloody nose. Mother also told a police officer who responded to a domestic disturbance call that she was afraid of Father and refused to open the door to admit the officer into her home. Rather than acknowledge the fact that exposing the children to domestic violence would subject them to emotional and potentially physical harm, Mother minimized the issue and expressed no intention to make any changes. There was also evidence at trial that Mother had not demonstrated the ability to provide a stable home or comply with a family service plan. Specifically, Mother continued to live with Father and expressed no intention of living separately from him. A parent's drug use, inability to provide a stable home, failure to comply with a family service plan, and continuing to subject children to domestic violence support a finding that termination is in the best interest of the child. *See In re S.B.*, 207 S.W.3d 877, 887-88 (Tex. App.—Fort Worth 2006, no pet.). Although the children were too young to express their wishes, there was evidence that they had done extremely well in their foster placement in Dallas, which was where the Department intended to return them once the placement's license was renewed. The evidence that E.L., M.M., and J.M. each improved after the Department placed them with a foster family supports the trial court's finding that termination was in the children's best interest. *See S.B.*, 207 S.W.3d at 887. Applying the applicable standards of review, we conclude that the evidence was legally and factually sufficient

30

to support a finding that it was in the children's best interest to terminate Mother's parental rights. We overrule Mother's fifth appellate issue.

*Ineffective Assistance of Counsel*

In her sixth issue, Mother argues that her trial attorneys failed to provide effective assistance of counsel. Claims of ineffective assistance of counsel in parental-rights termination cases are evaluated under the two-prong *Strickland* test set forth by the United States Supreme Court for criminal cases. *In re M.S.*, 115 S.W.3d 534, 544–45 (Tex. 2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Under this test, parents must show both that (1) their attorney's performance was deficient and fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced their defense. *Id*. at 545; *see Strickland*, 466 U.S. at 687; *see also In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (following two-prong *Strickland* test).

In analyzing whether counsel's performance was deficient, we "tak[e] into account all of the circumstances surrounding the case" and "primarily focus on whether counsel performed in a reasonably effective manner." *In re M.S.*, 115 S.W.3d at 545 (internal quotations omitted); *see In re H.R.M.*, 209 S.W.3d 105, 111 (Tex. 2006). We "give great deference to counsel's performance, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions are strategic." *In re M.S.*, 115 S.W.3d at 545 (internal quotations omitted); *see In re H.R.M.*, 209 S.W.3d at 111. "An assertion of ineffective assistance will be sustained only if the record affirmatively supports such a claim." *In re A.A.H.*, Nos. 01-19-00612-CV & 01-19-00748-CV, 2020 WL 1056941 at *21 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, pet. denied) (mem. op.); *Lockwood v. Texas Dep't of Fam. & Protective Servs.*, No. 03-12-00062-CV, 2012 WL 2383781

at *5 (Tex. App.—Austin June 26, 2012, no pet.) (mem. op.). Thus, when the record is silent regarding counsel's reasons for his conduct, as it is here, "we defer to counsel's decision if there is at least the possibility that the conduct could have been legitimate trial strategy." *In re A.A.H.*, 2020 WL 1056941, at *22. "Challenged conduct constitutes ineffective assistance only when it is 'so outrageous that no competent attorney would have engaged in it.'" *In re H.R.M.*, 209 S.W.3d at 111 (citation omitted).

To satisfy the second prong of the Strickland test, the record must show that there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. *In re M.S.*, 115 S.W.3d at 549–50; *see Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."); *Medellin v. Texas Dep't of Fam. & Protective Servs.*, No. 03-11-00558-CV, 2012 WL 4466511 at *4 (Tex. App.—Austin Sept. 26, 2012, pet. denied) (mem. op.) (requiring parent to show that there was "a reasonable probability that his parental rights would not have been terminated" (citing *Strickland*, 466 U.S. at 694)).

Mother first asserts that appointed counsel's performance was deficient because counsel failed to appear at a January 27, 2022 permanency hearing. Mother argues that counsel should have appeared and requested that the case involving J.M. be dismissed because the previous permanency hearing had taken place on September 3, 2021, more than 120 days earlier. *See* Tex. Fam. Code § 263.305 ("A subsequent permanency hearing before entry of a final order shall be held not later than the 120th day of the last permanency hearing in the suit."). However, even assuming that the remedy for the court's failing to hold a permanency hearing not later than the 120th day after the last permanency hearing would be dismissal of the case, the record reflects that permanency hearings for J.M. before entry of a final order were held on August 24,

2021 and December 15, 2021, which was 113 days later. On January 27, 2022, the court ordered J.M.'s case to mediation. The trial of J.M.'s case, which had been consolidated with E.L. and M.M.'s case, began on March 28, 2022, 103 days after J.M.'s second permanency hearing.

Mother next asserts that counsel's performance was deficient because she failed to request a de novo review of an Associate Judge's order to retain J.M.'s case on the court's docket pursuant to Texas Family Code subsection 263.401(b). *See* Tex. Fam. Code § 263.401(b) (providing court may retain case on court's docket after time described in subsection 263.401(a) only if it finds extraordinary circumstances exist that necessitate child remaining in temporary managing conservatorship of Department and that continuing appointment of Department is in child's best interest). Mother argues that the Associate Judge did not make the required findings and that counsel's failure to seek de novo review of the order constituted deficient performance because de novo review would have resulted in its being "overturned," resulting in the mandatory dismissal of J.M.'s case. The court's order, however, does include the findings that "extraordinary circumstances necessitate the children remaining in the temporary managing conservatorship of the Department" and that the "continuing appointment of the Department as temporary managing conservator is in the best interest of the children." Although Mother argues that the evidence does not support these findings, it is not evident that a court reviewing these findings would have agreed and set the order aside. *See In re D.S.*, 602 S.W.3d 504, 510 n.9 (Tex. 2020) (in absence of record we presume evidence was sufficient to support trial court's findings). Mother has not demonstrated that her attorney's decision not to seek de novo review of the Associate Judge's order to retain J.M.'s case on the court's docket constituted ineffective assistance of counsel.

Mother makes a number of additional complaints that her counsel's performance at trial was deficient, including counsel's decisions about what witnesses to present, the subject of examination and cross-examination of witnesses, the failure to examine certain other witnesses, failing to object to consolidation of J.M.'s case with E.L. and M.M.'s case, and failing to request additional time to prepare for trial. As is usually the case, on direct appeal we are unable to determine whether trial counsel's actions were grounded in sound trial strategy because the record is undeveloped and cannot adequately reflect the merits of an ineffective assistance of counsel claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct fell within a wide range of reasonable representation. *See Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005). Mother has failed to rebut the strong presumption that her counsel's conduct fell within a wide range of reasonable representation. We conclude that Mother has failed to meet her burden of establishing that her counselrendered ineffective assistance of counsel either before or during trial. We overrule Mother's sixth appellate issue.

**Father's Appeal**

In one appellate issue, Father challenges the legal and factual sufficiency of the evidence supporting that finding that termination of his parental rights to E.L., M.M., and J.M. was in their best interest. Like Mother, Father also failed to preserve a legal or factual sufficiency challenge to the jury's best interest finding by failing to either (1) move for a directed verdict, (2) object to the submission of a jury question, (3) move for judgment notwithstanding the verdict, or (4) move for a new trial. *See In re J.M. S.*, 43 S.W.3d at 62; *A.B. v. Texas Dep't of*

*Family & Protective Servs.*, 2019 WL 1220894, at \*2; *see also In re M.S.*, 115 S.W.3d at 547. Even had he preserved error, we would conclude that the evidence was both legally and factually sufficient to support the jury's best interest finding. Father's argument on appeal centers around his assertion that there was no evidence related to certain of the *Holley* factors, specifically the children's desires. However, at the time of trial, the children were six, four, and one year old. When children are too young to express their desires, the factfinder may consider evidence that the children have bonded with a foster family, are well-cared for by them, and have spent minimal time with a parent. *See In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.). Evidence presented at trial was that the children were doing well in foster care and were "growing into their personalities." There was also evidence that Father had spent minimal time with the children in the past several years.

Father also argues that the best interest of the children would be served by naming the Department as their sole managing conservator and placing them with his relatives rather than terminating his parental rights. There was evidence at trial, however, that numerous of the proposed relative placements were unsatisfactory either because of information learned during the home study or because of the failure to respond to home study related inquiries. There was also evidence that the children's best interest would be served by terminating Father's parental rights so the children could be adopted and achieve stability and permanency in their lives. Applying the applicable standards of review, we conclude that the evidence was legally and factually sufficient to support a finding that it was in the children's best interest to terminate Father's parental rights. We overrule Father's sole appellate issue.

## CONCLUSION

For the reasons set forth in this opinion, we affirm the trial court's final decree of termination and order for conservatorship.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed

Filed:    October 13, 2022